UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
                      :

MARC ALLEN FREUNDLICH        :            3:18 CV 1356 (RMS)
                      :

V.                          :
                      :

NANCY A. BERRYHILL,         :
ACTING COMMISSIONER OF    :
SOCIAL SECURITY[1]         :            DATE: JUNE  14, 2019
                      :
------------------------------------------------------- x

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING
THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff

Child's Insurance Benefits under the earnings record of his father.

I.      ADMINISTRATIVE PROCEEDINGS

On December 19, 2013, the plaintiff filed an application for Child's Insurance Benefits,

alleging disability due to attention deficit hyperactivity disorder ["ADHD"], anxiety, mood

disorder, and pervasive developmental disorder ["PDD"], beginning January 1, 2004, when the

plaintiff was fourteen years old.[2] (Certified Transcript of Administrative Proceedings, dated

---

[1] On January 21, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.  The Federal Vacancies Reform Act limits the time a position can be filled by an acting official, 5 U.S.C. § 3349(b); accordingly, as of November 17, 2017, Nancy Berryhill is serving as the Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security.

[2] A claimant is entitled to Child's Insurance Benefits on the earnings record of an insured person who is entitled to old-age or disability benefits if the child is the insured's child, a dependent of the insured, unmarried, and, if older than 18 years old, as it applies in this case, has a disability that began before the age of 22. 20 C.F.R. § 404.350(a). At the time of the hearing, held in November 2017, the plaintiff's father, Lester Freundlich, was receiving Social Security retirement benefits; it is on this earnings record that the plaintiff seeks Child's Insurance Benefits. (Tr. 78).

September 28, 2018 ["Tr."] 139, 203-04). His application was denied initially and upon reconsideration, and the plaintiff requested a hearing before an Administrative Law Judge ["ALJ"]. (Tr. 170-88, 190-91, 193-95). On November 16, 2017, a hearing was held before ALJ Eskunder Boyd at which the plaintiff, a vocational expert, the plaintiff's father, and Dr. Jeffrey Koffler testified. (Tr. 71-123; *see* Tr. 33-36, 39-44, 46-51, 64-65). On November 28, 2017, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits (Tr. 13-27), and on January 5, 2018, the plaintiff filed a request for review of the hearing decision. (Tr. 200). On June 29, 2018, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3).

On August 13, 2018, the plaintiff filed his complaint in this pending action (Doc. No. 1). The next day, the parties consented to the jurisdiction of a United States Magistrate Judge, and the case was transferred accordingly. (Doc. No. 10). On October 15, 2018, defendant filed an answer with a copy of the Certified Administrative Record, dated September 28, 2018. (Tr. 12; *see also* Tr. 14). On December 17, 2018, the plaintiff filed his Motion to Reverse the Decision of the Commissioner (Doc. No. 16), with a Statement of Material Facts (Doc. No. 16-2) and a brief in support (Doc. No. 16-3 ["Pl.'s Mem."]). On January 16, 2019, the defendant filed her Motion to Affirm (Doc. No. 17), with a Statement of Material Facts (Doc. No. 17-1), and a brief in support (Doc. No. 17-2 ["Def.'s Mem."]).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 16) is *granted* such that this case is remanded for further proceedings consistent with this Ruling, and the defendant's Motion to Affirm (Doc. No. 17) is *denied.*

II.     FACTUAL BACKGROUND

A.     HEARING TESTIMONY

At the time of the hearing, the plaintiff was twenty-seven years old. The plaintiff, his father, Lester Freundlich ["Mr. Freundlich"], his treating psychiatrist, Dr. Jeffrey Koffler, and a vocational expert testified.

The plaintiff testified that he was able to dress, bathe and groom himself, he could perform household chores "[a]t a basic level[,]" and, recently, he volunteered as an usher at a film festival in New York. (Tr. 106). When asked about his son's alleged disabilities, Mr. Freundlich testified that his son was dependent on him, that he financially supported his son, and that he tried to wake his son before leaving the house in the morning, but often his son did not get out of bed. (Tr. 85). According to Mr. Freundlich, the plaintiff could perform household chores, but "the typical response is that he doesn't do it." (Tr. 79). Mr. Freundlich, who is a "widower twice over[]" (Tr. 78), testified that his son thought "differently" and had "difficulty with interpersonal relations, taking instructions, [and] doing . . . tasks of daily living[.]" (Tr. 79). The plaintiff did not have what his father would call "a real friend"; he misreads people. (Tr. 85-86). He had placed the plaintiff in "programs where they tried to learn to get along with other kids[,]" but the programs did not help. (Tr. 85-86). Additionally, Mr. Freundlich explained that it was "more likely than not" that the plaintiff would not do something after being told to do so. (Tr. 86).

According to Mr. Freundlich, when in high school, the plaintiff had a "fairly detailed IEP," but the school "ignored it[,]" and he graduated high school even though he "did not deserve to pass[]" the English class that he needed to graduate. (Tr. 81). Mr. Freundlich explained that the school-recommended psychiatrist opined that the plaintiff was "not qualified to graduate[]" yet went to college "[a]s a result of a settlement." (Tr. 82-83). The plaintiff attended Mitchell College, which "specializes in providing education to college students with mental disabilities[,]" and then attended Curry College, which is made up of a similar population of students. (Tr. 93). The

plaintiff transferred to and graduated from the University of Connecticut ["UConn"] at Storrs with a degree in political science. (Tr. 93, 105).

The plaintiff has traveled in Greece, China and Israel. (Tr. 87, 113). Mr. Freundlich testified that his son traveled "primarily alone, with some limited support" when in Greece and China, and, during his trip to Greece, he had "[l]ots of problems[]" with his roommates. (Tr. 87). The plaintiff testified that he found the experiences in Greece and China "very stressful[]" (Tr. 113), and that he did not have good relationships with his roommates in college at UConn and Curry. (Tr. 88).

When asked if his son could perform the work of a janitor, Mr. Freundlich testified that his "mind would wander[,]" and he would fail to complete the set tasks. (Tr. 90). According to the plaintiff, he had a "hard time working in a normal group setting," and a "very hard time waking up on a regular time throughout the week." (Tr. 107). He did not have a lot of friends, and had trouble concentrating. (Tr. 109-10). At the time of the hearing, the plaintiff was working part-time performing data entry work. (Tr. 106). The plaintiff testified that he could not perform work "when [he] feel[s] drained during the day . . . or when feeling drained for whatever reason, either mentally or physically drained." (Tr. 114). Additionally, the plaintiff testified that he "might forget certain things," since when he performed the part-time data entry job, he had reminders and had someone to "make sure that things [were] being . . . done the way that . . . they want[ed] it to be done." (Tr. 115). As the plaintiff described it, his data entry job was "very accommodating[,]" allowing him to take off or take breaks whenever he wanted. (Tr. 116).

Mr. Freundlich described his son as depressed and testified that his son has had suicidal thoughts. (Tr. 91). According to Mr. Freundlich, his son has become "uncontrollable[.]" (Tr. 91).

Dr. Jeffrey Koffler, the plaintiff's psychiatrist and psychotherapist, testified that the plaintiff has "an autism spectrum disorder, a depressive disorder, an anxiety disorder, and . . . some ADHD[.]" (Tr. 97-98). Dr. Koffler explained that the plaintiff is "so talkative and so disfluent in his talking" and he "tends to go on and on[.]" (Tr. 98). According to Dr. Koffler, the plaintiff does not have an intellectual deficit or respond to internal stimuli, but he has "specialized interests" like "becoming a connoisseur of Japanese horror movies and of anime things in general[,]" he will "sometimes . . . over generalize" and has "trouble staying on task." (Tr. 100-01). Dr. Koffler testified that the plaintiff is "distracted by his own interests" and has reported that he felt his roommate in Greece could have killed him, and that if he was interviewed on a radio broadcast, people who listened might come after him. (Tr. 102-03). Dr. Koffler testified that there has not been an opportunity for the plaintiff to show that he could "run his own life fully[,]" but he opined that it would "[t]ake a long time to work up towards that." (Tr. 104).

A vocational expert then testified that a claimant who had no exertional limitations, could perform simple and detailed, although not complex tasks, could sustain concentration, pace and persistence for three-to-four-hour segments, and could have occasional interaction with coworkers and the public, could perform the work of a cleaner, a vehicle cleaner, or a store laborer. (Tr. 118-19). Similarly, the vocational expert testified that a claimant could perform those jobs even if the claimant was limited to work with little to no changes in duties or routines, no work requiring independent judgment, and no responsibility for the safety of others. (Tr. 119-20). If such a person could not sustain concentration, pace and persistence for two-hour segments, or would be off task at least fifteen percent of the workday, the vocational expert opined that the foregoing work could not be performed. (Tr. 120). Additionally, if a person was absent three to four days a month, "an employer would not tolerate that at all." (Tr. 120-21).

B.    MEDICAL HISTORY

1.    RECORDS PRE-DATING THE ALLEGED ONSET DATE OF DISABILITY

The first medical document of record is a letter from Dr. Murray Engel to Dr. Judith Nemec, dated July 7, 1997, in which Dr. Engel noted that the plaintiff had "anxiety" and "attentional problems." (Tr. 556-57). From May 25, 1999 to July 15, 1999, the plaintiff was treated in-patient and out-patient at the Four Winds Hospital for a history of "aggressive [and] impulsive behavior." (Tr. 498-550). At that time, he was described as a "9½ year old boy with long standing history of explosive disorder and mood swings [with] one prior impatient hospitalization[.]" (Tr. 505). The diagnoses were mood disorder, intermittent explosive disorder, and ADHD, combined type. (Tr. 508). He was discharged from the in-patient program on June 18, 1999 with prescriptions for Depakote, Zyprexa, Cylert, and Lithium (Tr. 516), and then, due to concerns for his safety, the plaintiff was re-admitted to the in-patient program on July 1, 1999 and discharged on July 15, 1999, with diagnoses of bipolar disorder, not otherwise specified and psychotic disorder, not otherwise specified. (Tr. 523). He was discharged with prescriptions for Lithium Carbonate, Thorazine, and Depakote. (Tr. 528).

Following his discharge from Four Winds, the plaintiff began treatment at KidsPeace National Center for Kids in Crisis on July 17, 1999. (Tr. 492-94). Dr. Chala Sargent Pratt completed a psychiatric evaluation in which he found the plaintiff "awkward[,]" his mood was "good[,]" his thought process was "clear[,]" and his insight and judgment were "nil." (Tr. 493). Dr. Pratt concluded that it was a "medical necessity that this child receive[ ] residential treatment to address the . . . documented pathology." (Tr. 494).

Two months later, school social worker Karen Holzman completed a Social Work Assessment for Stamford Public Schools in which she noted the plaintiff's problems in the "areas

of organizational skills and peer relations[,]" and that he was "so pre-occupied with his internal thoughts that he [was] oblivious of his immediate interpersonal environment." (Tr. 704-706).

The plaintiff underwent a psychiatric evaluation with Dr. Sanders Stein on January 21, 2000 (Tr. 476-78), which included "a synopsis of Marc's psychiatric history up until now[]" because Dr. Stein had been treating the plaintiff since August 1997. (Tr. 476). As of early 2000, the plaintiff's mental status was "clear," and there was no evidence of thought disorder, but his diagnoses remained bipolar disorder, not otherwise specified, with a past history of Tourette's syndrome, ADHD, obsessive-compulsive disorder, and PDD, and he continued to take Carbatroil, Lithium, and Thorazine. (Tr. 478).

On February 16, 2000, Dr. Engel reviewed results of EEG and MRI testing and concluded that "[c]linically[,] it [was] not clear that [the plaintiff] had clear seizures." (Tr. 554). A repeat EEG on June 5, 2000 was interpreted as an "abnormal EEG because of the right centrotemporal sharp and slow wave complexes." (Tr. 555).

From February 29, 2000 to June 7, 2000, the plaintiff was treated at the Mid-Fairfield Guidance Center, Inc., Prospects Extended Day Treatment & Partial Hospitalization Program for "very poor social skills[,]" "impaired school functioning[,]" oppositional behaviors, history of manic and out of control behavior, and "unresolved grief pertaining to [the] death of [his] mother." (Tr. 601-07).

At the request of his school social worker, the plaintiff was evaluated by Elizabeth Helmig, Psy.D. in early 2000 (Tr. 597-600), at which time the plaintiff was taking Tegretol, Lithium, Thorazine, and Carbotrol. (Tr. 598). Dr. Helmig noted that the plaintiff was, at that time, "a ten-year old boy with very high intelligence. However, his functioning [was] severely limited by his social skills deficits, his rigid and obsessive thinking style, his distractibility and hypomania." (Tr.

599). Dr. Helmig diagnosed the plaintiff with PDD, ADHD, and bipolar I disorder, and recommended continued treatment and medication management. (Tr. 599-600).

In June 2000, at the end of the plaintiff's fifth grade year, his school social worker detailed the treatment interventions for both the plaintiff and his family (Tr. 702), which appear to have resulted in some improvement, and she made recommendations for the 2000-01 academic year. (Tr. 703).[3]

The plaintiff saw Dr. Jon Durica of Stamford Pediatric Associates for an annual health check on April 23, 2003, at which time the plaintiff was "doing well in school[,]" and continued to take Lithium and Carbatrol for bipolar disorder, ADHD, and PDD. (Tr. 688-89).

In May 2003, when the plaintiff was an eighth grader, Kelly E. Sullivan performed an Occupational Therapy Observation of the plaintiff at the Turn of River Middle School. (Tr. 364-69, 558-60). Sullivan noted that the plaintiff's anxiety was a "concern[,]" he could "rarely complete[] assignments independently[,] and [he] require[d] much assistance to remain on task and complete assignments correctly." (Tr. 559). The plaintiff's "objective testing" in a language and speech assessment was "within the average range." (Tr. 352-53). The Neuropsychological Report completed in June 2003 identified slow processing speed and a nonverbal learning disability. (Tr. 354-63).

2.  RECORDS WITHIN THE PERIOD OF ALLEGED DISABILITY (2004-2011)

The plaintiff was seen by Dr. Durica on April 23, 2004 for his annual physical. (Tr. 694-95). At that time, the plaintiff was a ninth grader at the Academy for Information Technology and Engineering, described as "a C student" who was doing well at home. (Tr. 694-95). Dr. Durica

---

[3] The only pediatric medical record from 2002 is a one-page chart note from Dr. Lambros Geotes of Stamford Pediatric Associates, which notes that the plaintiff was in "some special education classes." (Tr. 684).

noted diagnoses of bipolar disorder, ADHD and PDD, as well as "some motivation issues in school[.] [N]o friends[.] [S]eems [i]solated[.] [S]trongly rec[ommend] counseling[.]" (Tr. 695).[4]

Elliot Zelevansky, Ph.D. treated the plaintiff in counseling sessions from June 25, 2004 to August 30, 2004 for "suspected bipolar disorder and oppositional behavior disorder." (Tr. 462) "The patient was completely refractory to participation in treatment and despite a variety of attempts to reduce his resistance, his refusal to participate was adamant and so treatment was terminated." (Tr. 462).

Dr. Lambros Geotes of Stamford Pediatrics performed an annual physical for the plaintiff on May 4, 2006, at which time the plaintiff was in eleventh grade, taking Lithium Carbonate. (Tr. 639-41). Additionally, in May 2006, the plaintiff underwent a neuropsychological evaluation for Stamford Public Schools at the request of the plaintiff's father. (Tr. 339-47, 465-73). The plaintiff went through a battery of tests and a clinical interview before Maria J. Harris, the school neuropsychologist, concluded that the plaintiff continued to "show significant processing speed and concentration difficulties[,]" and recommended "extended time and quiet setting for standardized testing and critical course testing and projects." (Tr. 471).

School psychologist Linda Wieland administered intelligence testing and evaluated the plaintiff in December 2006. (Tr. 329-35). Ms. Wieland noted that the plaintiff demonstrated an excellent attitude toward testing and displayed good attention and concentration throughout the session. (Tr. 329). She further noted that the plaintiff's cognitive abilities ranged from low average to superior, and that perceptual organization and processing speed issues were the plaintiff's biggest weaknesses. (Tr. 329). She concluded that the plaintiff struggled with significant

---

[4] A March 4, 2006 chart note from Dr. Alexandra Bonesho of Stamford Pediatric Associates (Tr. 643-45) indicates that the plaintiff had an upper respiratory infection and that he had returned two days prior from travel to Egypt and Germany (Tr. 643).

processing issues and that his learning profile was "reflective of a student with learning disabilities." (Tr. 330). She recommended that the plaintiff should advocate for support services for organization and writing assignments as he transitioned to college. (Tr. 330). Ms. Wieland also noted, after observing the plaintiff, that his "social communication, social responsiveness, creativity, and range of behaviors are not consistent with a classification of Autism." (Tr. 334-35).

At the request of the Bureau of Rehabilitation Services ["BRS"], Dr. Leon Tec completed an assessment of the plaintiff on January 11, 2007. (Tr. 474-75). Dr. Tec noted the plaintiff's difficulty in focusing and that he is "easily distracted, not disciplined, [and] needs prodding from his father." (Tr. 474). Dr. Tec recommended "continued psychotherapy [and] medication[.]" (Tr. 474). Dr. Tec described the plaintiff's communication skills as "not always clear"; he noted that, for "self-direction," the plaintiff "needs supervision"; and, he stated that the plaintiff's "work tolerance" is "moderate," and his "work skills" are limited "to some extent[.]" (Tr. 475).

The plaintiff's father and stepmother met with the plaintiff's teachers, school administrators, the school social worker, the school psychologist, and the guidance counselor in 2007[5] to discuss the plaintiff's future placement and plans. (Tr. 272-75). The plaintiff had passed the required State of Connecticut testing for high school graduation, scored a 1560 out of 2400 on his SAT, and obtained enough credits to graduate from high school. (Tr. 274). The school guidance counselor also discussed the plaintiff's trips abroad and summer camps in Israel "regarding [the plaintiff's] ability to be independent." (Tr. 274). His parents "felt that in a non[-]academic situation[,] [the plaintiff] performs well." (Tr. 274). The plaintiff's parents did not want the plaintiff to graduate. (Tr. 274).

---

[5] The exact date is not legible.

The plaintiff's high school social worker, Loralee Ballesteros, and special education teacher, Christian Betts, completed a checkbox functional assessment form in June 2007. (Tr. 261-71). They opined that the plaintiff did not have any problems carrying out single- or multi-step instructions, and only slight problems doing math calculations, providing oral explanations, and expressing ideas in written form. (Tr. 263). They opined that the plaintiff had a "slight-to-obvious" problem completing classroom and homework assignments, but only slight problems working at a reasonable pace, working without distracting himself, and focusing long enough to finish an assigned activity or task. (Tr. 264). They noted that the plaintiff did not require any assistance with activities of daily living and was assigned to the resource room at school to help organize his written assignments and to receive extra time for tests. (Tr. 264). Ms. Ballesteros and Mr. Betts further opined that the plaintiff had an obvious problem making and keeping friends, and a serious problem interpreting facial expressions and body language. (Tr. 265). In their opinion, the plaintiff had obvious problems using coping skills and regulating his moods (Tr. 268), he was "frequently late in arrival[,]" and he had serious familial issues and a hostile and dependent relationship with his father that directly correlated with his degree of independence. (Tr. 268-70).

At the request of the State Agency, Dr. Leon Tec completed another assessment of the plaintiff on June 18, 2007 (Tr. 479-82). Dr. Tec noted that he has treated the plaintiff on a monthly basis since January 3, 2005, and that the plaintiff's diagnoses were PDD, obsessive compulsive disorder, and anxiety. (Tr. 479). His therapeutic response was deemed "good," and Dr. Tec noted that the plaintiff was prescribed Tegretol and Lithium without side effects. (Tr. 479). Dr. Tec rated the plaintiff's prognosis as "fair" and noted his learning disability and "difficulty in school." (Tr. 480-81). According to Dr. Tec, the plaintiff was inattentive, distractible, impulsive, irritable, anxious, and becomes angry. (Tr. 481). He wrote that the plaintiff was "hard to wake up[,]" such

that he "still depend[ed] on [his] father to wake him up[.]" (Tr. 482). Dr. Tec indicated that the plaintiff had "fair peer relationship[s]" and "difficulty focusing." (Tr. 481-82).

On June 18, 2007, when the plaintiff was seventeen years old, Dr. John Gelinas authored an "Initial Notation of Child and Adolescent Psychiatric Findings" upon request of Stamford Public Schools. (Tr. 495). Dr. Gelinas opined that, at that time, the plaintiff had "not provided evidence of his ability to engage in or to practice the independent or transitional skills necessary to allow one to conclude that he is prepared to enter college[,]" and that, although it is possible that he could succeed in college, he would need "the comprehensive support of a significant degree of robustly applied academic and psychosocial supervision and oversight[.]" (Tr. 496). Dr. Gelinas noted the plaintiff's "significant interpersonal weaknesses that are manifestations of his diagnosis" of non-verbal learning disability, he "harbors a long-standing social phobia[,]" and, he "struggles significantly within the scope of his executive functioning, which limits his ability to plan, organize, prioritize, and attend to details and deadlines." (Tr. 496). Dr. Gelinas thought that the plaintiff's "poor academic record . . . [was] largely a direct result of his executive dysfunction, limited insight, and interpersonal deficits." (Tr. 496).

Dr. Gelinas noted nine Axis I diagnoses: learning disability – not otherwise specified; non-verbal learning disability; ADHD, primarily the inattentive type, and executive dysfunction; rule-out pervasive developmental disorder (atypical autistic disorder); parent-child relational problem; poor relational problem; academic problem; mood disorder – not otherwise specified (in full remission); rule-out social anxiety disorder (social phobia); history of obsessive compulsive disorder; and history of Tourette's syndrome. (Tr. 495-96).

The next medical record was not until July 23, 2010, when the plaintiff was seen by Dr. Shara Israel, who indicated, "Learning disability / ?Couldn't tell me anything?" (Tr. 564). Her

notes reflect that the plaintiff was in school at UConn (Storrs campus); "didn't do well last year." (Tr 564). She "strongly encouraged him to seek [mental health] therapy help, see if [it] can [reduce] anxiety/stress[, increase] conc[entration.]" (Tr. 565). She noted that the plaintiff was volunteering at a film festival. (Tr. 564).

Dr. Israel saw the plaintiff again on August 24, 2010, at which point "[t]hings at home [were] not good." (Tr. 562). She stated that the plaintiff was "[n]ot getting anything done. Eager to leave. Will get therapist at school." (Tr. 562). In November 2010, Dr. Israel noted that "[s]chool [was] ok." (Tr. 562). As of July 20, 2011, the plaintiff was taking classes at UConn in Stamford, was working at a film festival in New York City, and was biking regularly. (Tr. 561). Dr. Israel wrote that the plaintiff was "going to Greece for prolonged semester abroad[,]" and she assessed him as a "21 year old college junior with . . . Asperger's vs. learning disability?" (Tr. 561).

On December 20, 2011, the plaintiff reported seeing his school social worker weekly, was "[v]ery vague about how the semester went [and] about friends[, and was] [a]ngry that Dad calls him 'delusional,' [and] thinks he needs meds." (Tr. 561). Dr. Israel recommended therapy. (Tr. 561).[6]

### 3. RECORDS POST-DATING ALLEGED DISABILITY PERIOD[7]

In her September 2, 2014 chart note (Tr. 822-823), Dr. Israel wrote that the plaintiff graduated from UConn "1½ years ago" and "[w]as working part time. [He] [w]ent to China/Japan for 2½ months – friend's wedding, thought of teaching English, but [it] didn't work out. [He] [returned] a month ago." (Tr. 822). She continued, "Pollution. Much anxiety about many things. Jumping from one subject to another. Difficult to express himself clearly to me. … I told him I

---

[6] The plaintiff received primary care treatment from Dr. Israel during this intervening period.

[7] The plaintiff turned 22 years of age on November 21, 2011.

wasn't worried about his physical health but he should speak to Dr. Koffler about his med[ications] and maybe [the] need for change/addition[]???" (Tr. 822). The plaintiff reported that he was "[h]oping to get a job, not sure where, what." (Tr. 822). He was taking Vyvanse, and Dr. Israel noted that his mood "seem[ed] more anxious." (Tr. 823).

In her July 28, 2015 note, Dr. Israel stated that the plaintiff was prescribed Bupropion (Wellbutrin) as well as Vyvanse through Dr. Koffler, and that he felt like it was helping "a little[,]" but he was "[u]nder much stress, living at home, step mother has cancer, and father has been very difficult. Was in China in May, looking for a job now. Living at home." (Tr. 568-69, 740-41). The Vyvanse was "working – helping him to focus on tasks through the day[,]" and he "[d]oes seem more down. Slow to speak, loosening of associations/all over the place but seems more sullen." (Tr. 741).

Dr. Koffler completed an evaluation of the plaintiff on March 6, 2016, in which he discussed extensively the plaintiff's psychiatric history, including the educational and work accommodations he had received. (Tr. 484-86; *see* Tr. 866-68).[8] According to Dr. Koffler, it is "hard for [the plaintiff] to focus on a task[]" as "even single-step tasks are compromised both by his distractibility and, ironically, by his internal obsessive single-mindedness. Multistep instructions: so much worse!" (Tr. 490). Dr. Koffler explained that the plaintiff's "psychological symptoms interrupt both his persistence in simple activities and cooperation with others when they are present." (Tr. 490). He rated the plaintiff's ability to carry out single-step instructions as "[s]ometimes a problem[,]" and his ability to carry out multi-step instructions, focus long enough to finish simple activities or tasks, and changing from one simple task to another as "[f]requently

[8] Dr. Koffler began treating the plaintiff in August 2012, yet his first medical record before the ALJ is dated March 6, 2016. At the hearing, Dr. Koffler testified that there was a "sewage overflow into [his] office," so a lot of his records "just got drenched and were thrown out." (Tr. 104). *See* Section V.A. *infra*.

a problem[.]" (Tr. 490). According to Dr. Koffler, it is "[a]lways a problem" for the plaintiff to perform basic activities at a reasonable pace, and to persist in simple activities without interruption from psychological symptoms." (Tr. 490). Dr. Koffler explained:

> Usually it is hard for Mr. Freundlich to focus in on a task, especially if it is at another's suggestion or assignment. Even single-step tasks are compromised both by his external distractability and, ironically, by his internal obsessive single-mindedness. Multi-step instructions: So much worse! . . . And changing from one task to another is similarly poor, relying as it does on his impairment in task-adherence. Focusing long enough to finish simple activities or tasks is quite limited. For example, if he should decide to show me a screen or a video on his phone, he will often get lost in a series of distractions along the way before showing me (and first having to try to remember) what it was that [he] originally wished to share with me. He tends to talk as he pursues a task, slowing the performance even of basic activities. This is one way in which his psychological symptoms interrupt both his persistence in simple activities and cooperation with others when they are present. It is very hard for him to stop talking, to adjust to/perceive others' nonverbal cues, and to hear others rather [than] talk over others.

(Tr. 490).

Dr. Koffler attached an undated detailed summary of the plaintiff's psychiatric history to this medical source statement. (Tr. 484-86, 866-69). In pertinent part, Dr. Koffler stated that the plaintiff's employment situation was "atypical" as it was

> one fostered by a friend of his long-deceased mother, who watches over the situation and allows for Marc to be there on his own terms: when he can (his adherence to schedule is unreliable and most of his tasks are solitary) and despite his tendency to interrupt his own work for conversation breaks whenever he cannot sustain focus and task-adherence – and to interrupt the activities of others.

(Tr. 868). Dr. Koffler's expressed his "professional opinion" that the plaintiff's

> Autism Spectrum Disorder has contributed greatly to his vocational limitations, in ways that include his failure to acknowledge and respond to others' nonverbal cues; his having highly restricted special interests which might put others off (such as a Japanese horror film genre); his tendency to talk on and on without clarifying whether his audience is interested in what he is saying or in how he is saying it; and his habit of repeating statements of his viewpoint without asking others about theirs. From all that I have gathered, these aspects of disability have been present and developing in Marc lifelong, complicating both his individual life and his family life.

(Tr. 868).

When Dr. Israel saw the plaintiff on June 14, 2016, she noted that the plaintiff's step mother had "metastatic pancreatic cancer to [the] liver[.]" (Tr. 735). She stated that the plaintiff will "discuss [the situation] more with Dr. Koffler[, and] [w]ill try to bike more with dad and be sensitive to [the] situation[.]" (Tr. 735).

In a letter dated January 23, 2017, Dr. Koffler described the plaintiff's "communication difficulties" as "astonishing [and] complicated" in that they are a "mix of physical (affecting phonation), cognitive (affecting thought-processing and intelligibility of speech), and autism spectrum issues (affecting the ability to engage in mutually comfortable conversation)[.]" (Tr. 872). He treated the plaintiff for "a number of conditions" including ADHD (combined type), unspecified anxiety disorder, Major Depressive Disorder (recurrent episode, moderate), Autism Spectrum Disorder requiring support, and Childhood Onset Fluency Disorder. (Tr. 872). Dr. Koffler stated:

> it is so hard to have effective conversation with him because he does not know when it is the other person's turn to speak, and he will go on and on about side issues so that the original topic gets lost. It is very wearing being with, and speaking with, him. These are overt factors in his not obtaining employment. Mr. Freundlich is exceptionally disabled in pragmatic language, and without speech-language therapy . . . he may remain this way, unable to obtain sufficient employment for him to support himself, or to socialize and have support network.

(Tr. 872). Dr. Koffler saw the plaintiff on October 6, 18, 26 and 31, 2017. (Tr. 853-59).

On February 11, 2016, Maurice Prout, PhD, completed an assessment of the plaintiff for the period of November 21, 2007 to November 21, 2011 in connection with the plaintiff's application for benefits in which he opined that the plaintiff had only moderate difficulties in maintaining social functioning and was moderately limited in his ability to interact appropriately with the general public, accept instructions, respond appropriately to criticism from supervisors,

and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 146-47, 149). Dr. Prout clarified that the plaintiff was able to understand and follow simple and complex directions on a sustained basis, to sustain attention, concentration and persistence, to interact with the general public, supervisors and peers on an occasional basis, and to adapt to routine changes in the work environment. (Tr. 136).

On August 3, 2016, Dr. Christopher Leveille completed the same assessments of the plaintiff for the period of November 21, 2007 to November 21, 2011. (Tr. 133-34). Dr. Leveille assessed that the plaintiff had mild restrictions in his activities of daily living and in his ability to maintain concentration, persistence or pace, and moderate difficulties maintaining social functioning. (Tr. 133). Like Dr. Prout, he found the plaintiff moderately limited in his ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 136).

Finally, the plaintiff's part-time employer, Leah Tillman, Ph.D., provided a statement in which she reported that the plaintiff was employed by her organization as an act of charitable kindness, and that he scans documents into an archival program. (Tr. 449). She advised that the plaintiff worked different hours each week and was easily distracted by coworkers, his phone, and music. (Tr. 449).

III.    THE ALJ'S DECISION

Following the five-step evaluation process,[9] the ALJ found that the plaintiff had not attained age 22 as of January 1, 2004, the alleged onset date. (Tr. 18, citing 20 C.F.R. §§ 404.102

---

[9] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 404.1520(a). First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant was employed during the relevant period, the claim is denied. *Id.* If the claimant was not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20

and 404.350(a)(5)). The ALJ concluded that, based on the plaintiff's limited earning record of $1,450.00 in 2010, he had not engaged in substantial gainful activity since January 1, 2004. (Tr. 18, citing 20 C.F.R. §§ 404.1571 *et seq.*). At step two, the ALJ concluded that, prior to attaining age 22, the plaintiff had the following severe impairments: Autism Spectrum Disorder, Bipolar Disorder, Anxiety Disorder, and ADHD (Tr. 18, citing 20 C.F.R. § 404.1520(c)), but that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18-19, citing 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

At step three, the ALJ found that, "[a]fter careful consideration of the entire record," the plaintiff, prior to age 22, had the residual functional capacity ["RFC"] to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant could perform simple, routine, repetitive tasks and sustain concentration, pace, and persistence for two-hour segments; the claimant could only have brief and superficial interaction with coworkers and no interaction with the public; the claimant required work with little to no changes in duties or routines and no work requiring independent judgment making (meaning no setting duties or schedules for others and no responsibility for the safety of others). (Tr. 20-25). The ALJ concluded that there were jobs that existed in significant numbers in the national economy that the

---

C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

plaintiff, prior to age 22, could perform, including work as a cleaner, vehicle cleaner, and laborer. (Tr. 25-26). Accordingly, the ALJ found that the plaintiff was not under a disability at any time prior to November 20, 2011, the date he attained age 22.  (Tr. 26, citing 20 C.F.R. §§ 404.350(a)(5) and 404.1520(g)).

IV.    STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where

the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.      DISCUSSION

The plaintiff contends that the treating source rule was not followed as the ALJ dismissed the treating physicians' opinions because, among other things, the plaintiff was capable of "independent travel" and "managed to acquire a bachelor's degree." (Pl.'s Mem. at 1-8). Additionally, the plaintiff argues that the ALJ improperly weighed the opinion of Dr. Tec and concluded that the plaintiff retained an RFC that was incompatible with the evaluations of Drs. Koffler and Tec. (Pl.'s Mem. at 10-13). The plaintiff also maintains that the administrative record was not developed with more recent treatment records from Drs. Koffler and Tec. (Pl.'s Mem. at 14-15). Lastly, the plaintiff asserts that the ALJ's step five findings were unsupported. (Pl.'s Mem. at 16-14).

The Court agrees with the plaintiff in that it concludes that the ALJ failed to consider the consistency of the treating providers' medical opinions and to fulfill his duty to develop the record. As a result, his weighing of the treating physician opinions is flawed.

A.      THE ALJ ERRED IN HIS CONSIDERATION OF THE TREATING SOURCE EVIDENCE IN THE RECORD

The treating physician rule requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128, (quoting 20 C.F.R. § 404.1527(d)(2) [now (c)(2)]). Conversely, a "treating physician's opinion does not get controlling weight when 'other substantial evidence in the record conflicts with the

treating physician's opinion.'" *Wright v. Barnhart*, 473 F. Supp. 2d 488, 493 (S.D.N.Y. 2007) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999)). When the ALJ does not give the treating source's opinion controlling weight, "the regulations require the ALJ to consider several factors[,]" including, the "'[l]ength of the treatment relationship and the frequency of examination'"; the "'[n]ature and extent of the treatment relationship'"; the "'relevant evidence . . ., particularly medical signs and laboratory findings,' supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist[.]" *Burgess*, 537 F.3d at 129 (quoting 20 C.F.R. § 404.1527(d)(2)(i)-(ii), (3)-(5)). Once the ALJ has considered these factors, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004); *see* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's medical opinion.").

The plaintiff argues that the ALJ erred in failing to assign controlling weight to Dr. Koffler's March 6, 2016 evaluation, and his testimony at the November 16, 2017 hearing before the ALJ. (Pl.'s Mem. at 2-10). The plaintiff asserts that there "is nothing from any physician or clinician who has actually treated [the plaintiff] that in any way contradicts Dr. Koffler's well-supported assessment of [the plaintiff's] capacities." (Pl.'s Mem. at 4).

Dr. Koffler is the plaintiff's treating psychiatrist. He began treating the plaintiff on August 17, 2012, on a weekly basis "much of the time[]" (Tr. 483), and his March 6, 2016 evaluation is remarkable for its thoroughness. Specifically, Dr. Koffler noted the plaintiff's tendency to talk "endlessly[,]" as well as his several "social interaction problems" and that his "endless[] talk[ing] without adjusting to others' timeframes continue[s] to reflect the neurodevelopmental challenges

which have affected his life and relationships all the way through." (Tr. 485).[10] Dr. Koffler explained that the plaintiff's social interactions were "fraught with problems, largely due to his difficulty fielding signals from others, and his persistent [and] repetitive behavior." (Tr. 490). According to Dr. Koffler, the plaintiff was "frequently" limited in his ability to interact appropriately with others and in his ability to respect or respond appropriately to others in authority, and he had "[n]o ability" or it was "always a problem" for him to ask questions, request assistance or get along with others without distracting them. (Tr. 490).

Dr. Koffler found the plaintiff "highly distractible both within himself and by external stimuli, leading to his habit of talking himself through actions to try to maintain his own focus." (Tr. 487). He described the plaintiff's speech as "atypical[,]" and the content "fluctuates" as does his mood. (Tr. 487). He noted "bursts of [illegible] phrases, pauses (silence) and stammering interspersed, so overall his speech production [was] dysfluent. He often gets very fast, then very slowed down, with intermittent pressure of speech. Very overtalkative, often rambling, and even when told he must stop he [kept] talking on and on." (Tr. 487). At the hearing, Dr. Koffler explained that the plaintiff's sessions "tend[ed] to be longer than an average session" because he "tend[ed] to go on and on and on and on[.]" (Tr. 98).

In terms of his thought content, Dr. Koffler reported that the plaintiff's "content fluctuates, and also varies over the long term. Mr. Freundlich will get excited talking about (unusual) fields of interest such as Japanese horror movies and anime genre in general, but also conventional ones such as business and the stock market – with rather fixed, strong opinions." (Tr. 487). Dr. Koffler explained that the plaintiff "[could] be told dozens of times (and has been, by me) that he [was]

---

[10] Regarding the familial relationships, Dr. Koffler noted that the plaintiff's "[f]ather does not believe in [the] patient or in his capacities. Father and stepmother have for decades tried to isolate and to exclude [him] from the family. Patient feels demoralized and angry. He cannot understand why, with his intellect and abilities, no one has offered him a full[-]time job." (Tr. 487).

not listening and [that] [did] not lead to corrected efforts to listen better, and not to interrupt – or to stop talking when the other person needs to leave." (Tr. 487).

As for the plaintiff's affect, Dr. Koffler opined that it "varie[d] between mildly blunted and constricted, and brightly [illegible] and enthusiastic." (Tr. 487). His "[m]ood fluctuate[d]; bright and expansive when he feels things [were] going his way; often sad and pessimistic when he [felt] misunderstood and not cared about. Hostile verbally when he [felt] attacked and/or belittled (especially by family members)[.]" (Tr. 487). Dr. Koffler rated the plaintiff's insight as "poor[,]" his social judgment as "very poor[,]" reflecting "chronic disability deriving from his autism spectrum disorder[,]" and his ability to handle frustration was "quite poor[] most of the time." (Tr. 487).

At the hearing, Dr. Koffler testified that the plaintiff was "unable to keep to a fixed schedule[,]" yet when asked, Dr. Koffler stated that the plaintiff had not missed many appointments. (Tr. 98). He testified that the plaintiff did not exhibit responses to internal stimuli, he had "specialized interests" but no abnormal thought processes, and that his ability to work would be limited by his distractions related to his own interests. (Tr. 98-102).

The issue in this case is that the ALJ discounted Dr. Koffler's opinion and testimony, not because it was unsupported by conflicting medical evidence, but because he found Dr. Koffler's "observations [in] contrast with the claimant's ability to independently travel[,]" and that he found his testimony that the plaintiff did not feel that his father helped him with planning his life as "suggest[ive] [of the fact] that the claimant has the ability to make some independent planning." (Tr. 23). Specifically, the ALJ rejected Dr. Koffler's opinion that the plaintiff had "frequent" limitations "in using coping skills or using good judgment[,]" because this did "not fit with the claimant's independent ability to travel overseas." (Tr. 23).

When "'other substantial evidence in the record conflicts with [a] treating physician's opinion[,]'" the opinion is not entitled to controlling weight. *Wright*, 473 F. Supp. 2d 488, 493 (S.D.N.Y. 2007) (quoting *Snell*, 177 F.3d at 133). In this case, however, the treating providers' opinions are consistent, yet, the ALJ rejected these opinions in favor of his own assessment of the plaintiff's activities, with an emphasis on what he concluded was the plaintiff's "ability to travel independently." (Tr. 22).

In his evaluation, Dr. Koffler questioned the plaintiff's capabilities when traveling abroad. Dr. Koffler found it "[u]nclear whether [the plaintiff's] life was truly endangered/threatened by his roommate for his school semester(s) in Greece, but he believes so." (Tr. 487). Similarly, Dr. Koffler stated that the plaintiff "continue[d] to spend time thinking about kinds of jobs he can apply for, usually through imagining networking possibilities, but these have not been fruitful." (Tr. 483). Dr. Koffler rated the plaintiff's coping skills, ability to handle frustration appropriately, and ability to use good judgment regarding safety and dangerous circumstances, as "[f]requently a problem." (Tr. 489). By example, he pointed out that the plaintiff's roommate in his foreign study program in Greece threatened the plaintiff's life, and someone stabbed him in the abdomen in a restaurant in Russia.[11] (Tr. 489). These incidents made Dr. Koffler wonder what the plaintiff did to provoke these actions, and whether the plaintiff was able to notice the risks inherent in certain situations. (Tr. 489). Dr. Koffler's opinions, therefore, question the plaintiff's ability to travel without being limited by his impairments. Yet, the ALJ assigned little weight to Dr. Koffler's opinions precisely because the plaintiff had traveled abroad "independently." (Tr. 22).

At the hearing, the ALJ had the benefit of testimony from Dr. Koffler, during which he could address the perceived inconsistency between Dr. Koffler's limiting assessments, and the

---

[11] It is not clear from the doctor's notes if these events actually occurred, or if these are just events reported by the plaintiff.

record of the plaintiff's travel. Yet, the ALJ did not ask Dr. Koffler to reconcile his opinion with the plaintiff's travels.

The defendant argues that the ALJ's failure to solicit testimony from Dr. Koffler about this perceived inconsistency did not constitute error because the ALJ considered testimony from the plaintiff and his father regarding the plaintiff's travels. (Tr. 87-88). The plaintiff's father testified that the plaintiff traveled in Greece and China "primarily alone, with some limited support at work." (Tr. 87). The ALJ did not inquire into the meaning of "limited support at work[,]" and thus, the Court cannot interpret the meaning of that response. When asked, the plaintiff described his travel to Greece and China as "study abroad" programs. (Tr. 113). His father explained that the plaintiff called frequently with "problems with his roommates[,]" but that he "survived" the program, which he described as "a high end program, in terms of standards[.]" (Tr. 87). Neither testified about the challenges, *if any*, that the plaintiff faced when travelling, nor did they explain the "independent" nature of this travel abroad. Rather, the plaintiff testified only that he found the experiences "stressful" in that he "didn't have much in common with any" of the other students. (Tr. 113). The ALJ's decision is far from clear in resolving this perceived inconsistency between the limiting assessment of the plaintiff's treating psychiatrist and the plaintiff's history of travel abroad.

Moreover, it is notable that Dr. Koffler's 2016 assessment is consistent with several opinions issued during the plaintiff's alleged period of disability, prior to the time-period when the plaintiff attended college and traveled abroad. Specifically, Dr. Koffler's 2016 opinion is consistent with the June 2007 opinions of the plaintiff's high school social worker, Loralee Ballesteros, and special education teacher, Christian Betts, to which the ALJ assigned partial weight in his decision. (Tr. 24; *see* Tr. 264-65). Ballesteros and Betts found that the plaintiff had

a "slight-to-obvious" problem completing classroom and homework assignments, an obvious problem making and keeping friends, and a serious problem interpreting facial expressions and body language. (Tr. 264-65). Additionally, in their opinions, they concluded that the plaintiff had an obvious problem using coping skills and regulating his moods (Tr. 268), he was "frequently late in arrival[,]" and he had serious familial issues and a hostile and dependent relationship with his father that directly correlated with his degree of independence. (Tr. 268-70).

Similarly, the opinions of Dr. Tec, who treated the plaintiff from age fifteen to seventeen, are consistent with Dr. Koffler's opinion. Dr. Tec noted the plaintiff's difficulty in focusing, and the fact that he was "easily distracted, not disciplined, [and] need[ed] prodding from his father." (Tr. 474; *see also* Tr. 475, 481-82). Additionally, Dr. Tec assessed the plaintiff as inattentive, distractible, impulsive, irritable and anxious. (Tr. 481).

Dr. Koffler's opinion is consistent as well with the opinion of Dr. John Gelinas, who completed an "Initial Notation of Child and Adolescent Psychiatric Findings" on June 18, 2007, when the plaintiff was seventeen. Dr. Gelinas opined that the plaintiff had "significant interpersonal weaknesses that are manifestations of his diagnosis" of non-verbal learning disability, he "harbors a long-standing social phobia[,]" and, he "struggles significantly within the scope of his executive functioning, which limits his ability to plan, organize, prioritize, and attend to details and deadlines." (Tr. 496). Dr. Gelinas opined that the plaintiff's "poor academic record . . . [was] largely a direct result of his executive dysfunction, limited insight, and interpersonal deficits." (Tr. 496). Additionally, Dr. Gelinas opined that, as of June 2007, there was no "evidence of [the plaintiff's] ability to engage in or to practice the independent or transitional skills necessary to allow one to conclude that he is prepared to enter college[,]" and that, while it is possible that he could succeed in college, he would need "the comprehensive support of a significant degree of

robustly applied academic and psychosocial supervision and oversight[.]" (Tr. 496). The ALJ rejected this portion of Dr. Gelinas' opinion, stating that such a "conclusion did not enjoy the benefit of fruition as the claimant did attend [c]ollege." (Tr. 22).

Although the Court finds error in the ALJ's rejection of all of the treating providers' opinions in favor of his conclusion that the plaintiff was capable of independently travelling abroad, *see Ackerman v. Colvin,* No. 13 CV 6675(RLE), 2015 WL 1499459, at *14 (S.D.N.Y. Mar. 31, 2015) (holding that the ALJ erred by resting "much of his analysis on Ackerman's activities"), the Court concludes that the ALJ did not err in his consideration of the fact that the plaintiff completed college. The ALJ appropriately referred to the fact that the plaintiff attended three colleges, two of which had special needs programs, and that he graduated successfully from UConn "(away from his home)." (Tr. 22). In his decision, the ALJ cited to references in the plaintiff's school records in which a team of teachers and his social worker discussed the plaintiff's trips abroad as evidence of the plaintiff's "ability to be independent[,]" and the fact that his parents "felt that in a non academic situation[,] [the plaintiff] performs well." (Tr. 274; *see* Tr. 22). The plaintiff argues, however, that the record was "inadequately developed as to Mr. Freundlich's college career[,]" and that there is no additional evidence before the Court as to the "accommodations and special support" that he may have received. (Doc. No. 16, Brief at 6).

The contemporaneous treatment records from Dr. Israel reflect that the plaintiff "didn't do well" while in college (Tr. 564), and Dr. Israel "strongly encouraged him to seek [mental health] therapy help, [to] see if [it] [could] [reduce] anxiety/stress[, and increase] conc[entration.]" (Tr. 565). That is the extent of information relating to the plaintiff's performance in college.

Although the record lacks information about the level of support the plaintiff received in college, the mere fact that the plaintiff completed college, is evidence the ALJ properly considered.

20 C.F.R. § 404.1527(c)(4); *see Parks v. Comm'r of Soc. Sec.*, No. 7:14 CV 1367(GTS), 2016 WL 590227, at *8-9 (N.D.N.Y. Feb. 11, 2016) (ALJ did not err in determining that the plaintiff's complaints were not supported by the evidence of record, including medical evidence, the plaintiff's activities, and plaintiff's ability to attend college full time during the time period in which she alleged disability). That said, however, the fact that the plaintiff attended college does not equate to an ability to perform skilled work. *See Chiappa v. Sec'y of Dep't of Health, Ed. & Welfare*, 497 F. Supp. 356, 361 (S.D.N.Y. 1980). The ALJ must consider the medical evidence of record before determining whether the plaintiff could perform work in the economy. *See also Ackerman*, 2015 WL 1499459, at *14 (holding that "completing college courses in fine arts and maintaining full or part-time employment cannot be equated, insofar as the time and stress associated with those activities are vastly different").

Although the ALJ appropriately considered the fact that the plaintiff completed college, he placed too great an emphasis on that fact, and on his assessment of the plaintiff's activities. *See Ackerman*, 2015 WL 1499459, at *15 (concluding that "[a]lthough a claimant's daily activities can be considered as part of an RFC assessment," an ALJ errs when he "rests much of his analysis on [those] activities."). Moreover, he erred in rejecting the medical opinions in the record in favor of what he perceived as an inconsistency between those opinions and his assessment that the plaintiff could travel independently.

B.    THE ALJ FAILED TO DEVELOP THE RECORD AND, IN DOING SO, ERRED IN HIS TREATMENT OF DR. TEC'S OPINIONS

The ALJ's error in failing to reconcile the opinions of Dr. Koffler, Dr. Gelinas and Dr. Tec with his emphasis on the plaintiff's ability to travel and complete college is compounded by the

absence, not only Dr. Koffler's earlier treatment records,[12] but also of all of Dr. Tec's underlying treatment records. *See* 20 C.F.R. § 404.1512(e)(1)(further development of the record is necessary when the "report from a [claimant's] medical source contains a conflict of ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.").

The plaintiff alleges a period of disability from January 2004 until he reached age 22 in November 2011. Dr. Tec completed two assessments of the plaintiff during that time period: the first was at the request of BRS, on January 11, 2007 (Tr. 474-75); the second was at the request of the State Agency, on June 18, 2007. (Tr. 479-82). In the first assessment, in addition to noting the plaintiff's difficulty in focusing and that he was "easily distracted, not disciplined, [and] need[ed] prodding from his father[,]" Dr. Tec recommended "continued psychotherapy [and] medication[.]" (Tr. 474). Dr. Tec described the plaintiff's communication skills as "not always clear"; he noted that, for "self-direction," the plaintiff "need[ed] supervision"; and, he stated that the plaintiff's "work tolerance" was "moderate" and his "work skills" were limited "to some extent[.]" (Tr. 475). In his second assessment, Dr. Tec noted that he had treated the plaintiff on a monthly basis since January 3, 2005 and had diagnosed the plaintiff with PDD, obsessive compulsive disorder, and anxiety. (Tr. 479). His therapeutic response was deemed "good," and Dr. Tec noted that the plaintiff was prescribed Tegretol and Lithium without side effects. (Tr. 479). Dr. Tec rated the plaintiff's prognosis as "fair[,]" and his learning disability and "difficulty in school" were noted. (Tr. 480-81). According to Dr. Tec, the plaintiff was inattentive, distractible, impulsive, irritable, anxious, and prone to anger. (Tr. 481). He also noted that the plaintiff was

---

[12] Although the 2012-2016 treatment records from Dr. Koffler are missing, Dr. Koffler explained at the hearing that there was a "sewage overflow into [his] office," so a lot of his records "just got drenched and were thrown out." (Tr. 104).

"hard to wake up[,]" such that he "still depend[ed] on [his] father to wake him up[.]" (Tr. 482). Dr. Tec wrote that the plaintiff had "fair peer relationship[s]" and "difficulty focusing." (Tr. 481-82).

The ALJ assigned "little weight" to this second opinion in that it "does not provide very specific functional limits[,]" "there are no findings for work related limitations[,]" and "the questionnaire provides little support or explanation for the responses provided." (Tr. 23). The form completed by Dr. Tec, about which the ALJ complains, is a State Agency questionnaire, and Dr. Tec's responses correlate precisely with the questions he was asked. (Tr. 480-82). Moreover, Dr. Tec's responses regarding the plaintiff's attention, concentration, mood and affect are all "work related limitations[,]" (Tr. 481), and these findings are consistent with Dr. Koffler's assessments as to the plaintiff's lack of good judgment, coping skills and ability to handle frustration appropriately. (Tr. 489).

The plaintiff appropriately argues that there is a gap in the record in that Dr. Tec's underlying treatment records were not before the ALJ. (Doc. No. 16, Brief at 12). In his June 18, 2007 assessment, Dr. Tec noted that he had treated the plaintiff on a monthly basis since January 3, 2005 (Tr. 479), yet, none of the underlying treatment records were before the ALJ. "The duty of the ALJ to develop the record is particularly important when it comes to obtaining information from a claimant's treating physician." *Devora v. Barnhart*, 205 F. Supp. 2d 164, 172-73 (S.D.N.Y. 2002). The plaintiff is correct that, in a case such as this, the actual testimony by a treating physician is "critical precisely because the contemporaneous treatment notes do not include the detailed, function-by-function limitations a medical source statement asks the clinician to assess." (Doc. No. 16, Brief at 13).

Although there is no medical source statement or testimony from Dr. Tec, the ALJ had the benefit of live testimony from Dr. Koffler. However, the ALJ did not ask Dr. Koffler about the plaintiff's ability to travel and complete college and how that information reconciled with the opinions in the record, including Dr. Koffler's own view of the plaintiff's impairments, nor did he ask about the content of Dr. Koffler's missing medical records. Additionally, the ALJ rejected Dr. Tec's assessment because it did not include the type of information contained in a medical source statement yet he neither requested a medical source statement from Dr. Tec, nor sought his underlying records.

Before determining whether the ALJ's findings are supported by substantial evidence, the Court "must first be satisfied that the claimant has had a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act." *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990) (citations & internal quotations omitted), *abrogation on other grounds recognized by Desane v. Colvin*, No. 3:15 CV 50 (GTS), 2015 WL 7748877, at *4 (N.D.N.Y. Nov. 30, 2015). Unlike adversarial proceedings, Social Security disability determinations are "investigatory, or inquisitorial," and the ALJ has a "duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Moran v. Astrue*, 569 F.3d 108, 112–13 (2d Cir. 2009) (citing *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004) (additional citations & internal quotations omitted)). "It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must [him]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.' This duty . . . exists even when . . . the claimant is represented by counsel." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)). "[W]here the administrative record contains gaps, remand to the

Commissioner for further development of the evidence is appropriate." *Butts*, 388 F.3d at 385 (citation omitted).

The Second Circuit has made clear that "a record containing numerous or obvious gaps should prompt an ALJ to pursue additional information." *Johnson v. Berryhill*, No. 3:17 CV 1651(VAB), 2019 WL 1430242, at *7 (D. Conn. Mar. 29, 2019) (citing *Rosa*, 168 F.3d at 79-80). That said, however, remand is not necessary when the ALJ has "voluminous" medical records, including an assessment of the claimant's limitations from a treating physician. *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013).

As discussed above, the period of alleged disability spans from 2004 to 2011, and Dr. Tec treated the plaintiff monthly, from January 2005 to June 2007. While there are school records from 2006 and 2007, there are no treating provider records during this period. The ALJ erred in the weight he assigned to Dr. Tec's opinion, and his error is compounded by his failure to fill this important gap in the treatment records. Accordingly, remand is warranted. *See Moran*, 569 F.3d at 114-15 (holding that remand is necessary when the ALJ failed to develop a "more comprehensive record before making his decision[,]" and failed to elicit testimony about the limited work history of the plaintiff on which the ALJ relied in denying benefits); *see also Johnson*, 2019 WL 1430242, at *8-9 (holding that the ALJ erred by failing to develop the record when nineteen months of health records were missing).[13]

---

[13] In light of this conclusion, the Court declines to address the plaintiff's step five argument.

VI.    CONCLUSION

Accordingly, for the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 16) is *granted*, and the defendant's Motion to Affirm (Doc. No. 17) is *denied*. This case is remanded to the Social Security Administration for further proceedings consistent with this Ruling.

This is not a recommended ruling.  The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c). The Clerk's Office is instructed that, if any party appeals to this Court the decision made after this remand, any subsequent social security appeal is to be assigned to the Magistrate Judge who issued the Ruling that remanded the case.

Dated this 14th day of June, 2019 at New Haven, Connecticut.

 /s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge